UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| 12 PERCENT LOGISTICS, INC., et al., ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Case No. 17-cv-02000 (APM) |
| ) | |
| UNIFIED CARRIER REGISTRATION ) | |
| PLAN BOARD, et al., ) | |
| ) | |
| **Defendants.** ) | |

# MEMORANDUM OPINION

## I.

On March 23, 2020, the court granted in part and denied in part Plaintiffs' Application and Motion for Attorneys' Fees, Costs, and Expenses Under the Sunshine Act. *See 12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.* (*12 Percent I*), Case No. 17-cv-2000, 2020 WL 1429904 (D.D.C. Mar. 23, 2020). The court held that Plaintiffs were entitled to an award of attorneys' fees and costs for their successful Sunshine Act claims, but found that Plaintiffs had not supplied sufficient evidence to support their specific fee request. *See id.* at *7–8. In particular, the court held that Plaintiffs had failed to justify the applicability of the hourly rates set forth in the Legal Services Index–adjusted *Laffey* Matrix ("LSI *Laffey* Matrix") and had not sufficiently identified the hours expended on tasks related to Plaintiffs' successful claims. *See id.* The court thus deferred fixing a final fee award and ordered Plaintiffs to submit additional support for their request. *Id.*

Now before the court is Plaintiffs' Response to that Order. *See* Pls.' Resp. to Ct.'s Order, ECF No. 132 [hereinafter Pls.' Resp.]. Plaintiffs seek an award of attorneys' fees, costs, and

expenses of at least $415,236.29, depending on whether the court adopts the rates set forth in the LSI *Laffey* Matrix or the lower rates set forth in the USAO Matrix, which Plaintiffs offer as an alternative. *See id.* at 1. For the reasons explained below, the court applies the rates set forth in the USAO Matrix and orders Defendant to pay Plaintiffs $116,538.19 in attorneys' fees, costs, and expenses.

## II.[1]

The usual method for ascertaining a reasonable fee award under a fee-shifting statute like the Sunshine Act, *see* 5 U.S.C. § 552b(i), is to calculate the "lodestar," which is determined by multiplying "the hours reasonably expended in the litigation by a reasonable hourly fee," *Bd. of Trs. of Hotel & Rest. Emps. Local 25 v. JPR, Inc.*, 136 F.3d 794, 801 (D.C. Cir. 1998). Courts have broad discretion in determining an appropriate fee award and may modify the request based on the reasonableness of the requested amount and the facts of the case. *Conservation Force v. Jewell*, 160 F. Supp. 3d 194, 203 (D.D.C. 2016) (citing *Judicial Watch, Inc. v. U.S. Dep't of Com.*, 470 F.3d 363, 369 (D.C. Cir. 2006)); *see also Fenster v. Brown*, 617 F.2d 740, 742 (D.C. Cir. 1979) (recognizing a court's considerable discretion in awarding attorneys' fees and costs). The moving party bears the burden of showing the reasonableness of its request. *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 969–70 (D.C. Cir. 2004). That includes demonstrating the reasonableness of the hourly rate and the reasonableness of the number of hours expended. *See Covington v. District of Columbia*, 57 F.3d 1101, 1107–08 (D.C. Cir. 1995). Once the plaintiff has met this burden, the burden shifts to the defendant to rebut the presumption of reasonableness

---

[1] The court incorporates by reference the factual and procedural background set forth in *12 Percent I*, 2020 WL 1429904, and *12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Board*, Case No. 17-cv-2000, 2019 WL 450676 (D.D.C. Feb. 4, 2019).

with "equally specific countervailing evidence." *Id.* at 1109 (quoting *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1326 (D.C. Cir. 1982)).

### III.

The court first addresses the reasonableness of Plaintiffs' proposed hourly rates before turning to the reasonableness of the hours expended. The court concludes with an analysis of Plaintiffs' request for "fees on fees."

### A.     The Reasonableness of the Hourly Rate

To show the reasonableness of a requested hourly rate, a plaintiff must submit evidence related to: (1) "the attorneys' billing practices"; (2) "the attorneys' skill, experience, and reputation"; and (3) "the prevailing market rates in the relevant community." *Covington*, 57 F.3d at 1107. In the Memorandum Opinion and Order partially denying Plaintiffs' initial fees request (the "Fees Opinion"), the court found that Plaintiffs "founder[ed] on the first and third [of these] prongs." *See 12 Percent I*, 2020 WL 1429904, at *6. As for the first, the court noted that Plaintiffs "ha[d] produced no proof whatsoever," including in the declaration of Plaintiffs' lead attorney, James Bopp, Jr., "as to . . . counsel's billing practices." *Id.* And "Plaintiffs [] f[e]ll well short of carrying their burden with respect to the third criterion," the court found, because they had not either (1) shown "that the litigation in question f[ell] within the bounds of complex federal litigation, and therefore, the [LSI] *Laffey* Matrix rates presumptively appl[ied]," or (2) provided "evidence of the fees charged, and received, by litigators in cases brought under the fee-shifting statute in question." *Id.* (cleaned up). The court thus concluded that "Plaintiffs ha[d] not satisfied their burden to demonstrate the reasonableness of the requested billing rates," but afforded Plaintiffs the opportunity to submit additional evidence. *Id.* at *7.

The court now reexamines these factors in light of Plaintiffs' supplemental filing.

3

### 1.  Attorneys' Billing Practices

The first criterion in establishing a reasonable hourly rate requires the fee applicant to show the rates that her attorney "customarily charges clients." *Covington*, 57 F.3d at 1103. The D.C. Circuit has opined that "an attorney's usual billing rate is presumptively the reasonable rate, provided that this rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Kattan ex rel. Thomas v. District of Columbia*, 995 F.2d 274, 278 (D.C. Cir. 1993) (quoting *Blum v. Stenson*, 465 U.S. 894, 895–96 n.11 (1984)). The Circuit also has held that when "prevailing attorneys request rates which are greater than those they normally charge, the attorneys must offer some evidence that they charge reduced rates for public-spirited or non-economic reasons" to ensure that the fee-shifting provision is not being used to "subsidize attorneys who charge below-market rates because they cannot command anything more." *Covington*, 57 F.3d at 1107–08. Examination of Plaintiffs' counsels' billing practices is therefore necessary before this court can "determine whether the requested LSI *Laffey* Matrix rates are in line with counsel's usual rates, and if they are not, whether awarding those rates would represent a windfall." *12 Percent I*, 2020 WL 1429904, at *6.

In support of their response to the Fees Opinion, Plaintiffs submit a second supplemental declaration from lead attorney James Bopp, Jr. *See* Pls.' Resp., Second Suppl. Decl. of James Bopp, Jr., ECF No. 132-3 [hereinafter Suppl. Bopp Decl.]. Mr. Bopp explains that the Bopp Law Firm ("BLF") "structures its rates in a variety of ways, including hourly rates, flat fees, contingency fees, and fee shifting work." *Id.* ¶ 5. According to Mr. Bopp, the fees in this case were structured "with BLF's national hourly billing rates, which are the rates that BLF regularly charges and receives for litigation supporting [its] core principles in the D.C. area." *Id.* He further explains that the national hourly billing rates for the seven attorneys involved in this litigation,

reproduced in the chart below, "are comparable to the USAO Matrix rates," which Plaintiffs offer as an alternative to the LSI *Laffey* Matrix. *Id.*

| Attorney Name | BLF National Hourly Rate |
|---|---|
| James Bopp, Jr. | $790.00 |
| Jeffrey P. Gallant | $500.00 |
| Anita Y. Milanovich | $485.00 |
| Courtney E. Milbank | $340.00 |
| Corrine L. Youngs | $340.00 |
| Amanda L. Narog | $340.00 |
| Melena Siebert | $300.00 |

Although BLF's national hourly rates are lower than the LSI *Laffey* Matrix rates that Plaintiffs request in the first instance, Plaintiffs explain the delta is attributable to the firm's "public spirited" mindset. *See* Pls.' Resp. at 8; *see also* Suppl. Bopp. Decl. ¶ 4 ("The rates that BLF charges for cases that support its core princip[les] are generally less than the rates that would be charged for similarly complex commercial work."). According to Mr. Bopp, the national hourly billing rates that BLF applied to this case "are the rates BLF regularly charges and receives for litigation supporting [its] core principles in the D.C. area." Suppl. Bopp. Decl. ¶ 5; *see* Pls.' Resp. at 10. Because the D.C. Circuit has warned against punishing attorneys who lower their rates for public-spirited reasons when applying a fee-shifting statute, *see Covington*, 57 F.3d at 1108, and because "BLF t[ook] the public benefit of [this] case into account when determining the rates it charge[d]," Pls.' Resp. at 8, 10, Plaintiffs argue that compensating their attorneys with the LSI *Laffey* Matrix rates would not "produce [a] windfall[]." *Blum*, 465 U.S. at 897 (internal quotation marks omitted).

5

Such a determination, however, relies primarily on consideration of the third reasonableness factor—the "prevailing market rates in the relevant community." *Id.* at 1107. That is, Plaintiffs must first show that this case is sufficiently complex to warrant application of the LSI *Laffey* Matrix before the court can consider Plaintiffs' plea not to discount their fees demand due to their "public-spirited" rates. *See Reed v. District of Columbia*, 843 F.3d 517, 521 (D.C. Cir. 2016) ("[T]he *Laffey* Matrix and subsequent revisions to this matrix apply only to 'complex federal litigation.'"); *see also DL v. District of Columbia*, 924 F.3d 585, 594 (D.C. Cir. 2019) (finding LSI *Laffey* Matrix presumptively applicable to "complex federal litigation"); *Urb. Air Initiative, Inc. v. EPA*, 442 F. Supp. 3d 301, 323 (D.D.C. 2020) (applying the USAO Matrix rates where plaintiffs had "not met their burden to show that it would be reasonable to apply the higher LSI adjusted *Laffey* Matrix rates"). The court now considers whether Plaintiffs have done so.

2. *Prevailing Market Rates*

To establish the prevailing market rate, "a fee applicant must produce satisfactory evidence—*in addition to* the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Eley v. District of Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015) (cleaned up); *see also Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1325 ("An applicant is required to provide specific evidence of the prevailing community rate for the type of work for which he seeks an award."). Fee matrices are "one type of evidence that 'provide[s] a useful starting point' in calculating the prevailing market rate." *Eley*, 793 F.3d at 100 (quoting *Covington*, 57 F.3d at 1109).

A fee matrix is "a chart averaging rates for attorneys at different experience levels. For decades, courts in this [C]ircuit have relied on some version of what is known as

6

the *Laffey* matrix." *DL*, 924 F.3d at 587.  The original *Laffey* Matrix, created in the 1980s, relied upon "a relatively small sample of rates charged by sophisticated federal-court practitioners in the District of Columbia." *Id*.  Since then, it has undergone several changes, and over time, the LSI *Laffey* Matrix and the USAO Matrix have emerged as two competing matrices for calculating attorneys' fees in Washington, D.C.  *Id.* at 590.[2]  The LSI *Laffey* Matrix rates are the higher of the two.  This is due, in part, to the fact that "[w]hile the LSI [*Laffey*] Matrix is designed to reflect the hourly rates charged by complex, federal court practitioners in Washington, D.C., the USAO Matrix has been based since 2015 on 'data for all types of lawyers—not just those who litigate complex federal cases—from the entire metropolitan area.'"  *Barton v. U.S. Geological Surv.*, Case No. 17-cv-1188 (ABJ), 2019 WL 4750195, at *5 (D.D.C. 2019) (quoting *DL*, 924 F.3d at 587).  The difference between the two matrices' rates is not insubstantial.  For instance, under the LSI Matrix, Mr. Bopp's rate in 2017 when this action was commenced was $864 per hour, while under the USAO Matrix it was $602 per hour.[3]

With that useful starting point in mind, a fee applicant can establish the prevailing market rate in one of two related ways.  First, the fee applicant can demonstrate that the litigation in question "fall[s] within the bounds" of "'complex federal litigation,'" and therefore the LSI *Laffey* Matrix rates presumptively apply.  *See Reed*, 843 F.3d at 521.  But "[t]his approach requires more than a conclusory declaration" as to "why the case deserves the label 'complex,'" *12 Percent I*, 2020 WL 1429904, at *6 (citing *Reed*, 843 F.3d at 525), and on that score Plaintiffs' initial fee

---

[2] For a fulsome discussion of the difference between the two matrices, including the data from which they are derived and the interest rates used to update them for inflation, see *Eley v. District of Columbia*, 999 F. Supp. 2d 137, 151–55 (D.D.C. 2015), *vacated & remanded on other grounds*, 793 F.3d 97.
[3] Mr. Bopp graduated law school in 1973, *see* Pls.' Mot. for Atty's' Fees, ECF No. 116, Ex. 2 to Decl. of James Bopp, Jr., ECF No. 116-4, at 1, and therefore falls into the LSI *Laffey* Matrix's rate category for attorneys with over 20 years of experience, *see Laffey Matrix*, http://www.laffeymatrix.com/see html (last visited Dec. 8, 2020), and the USAO Matrix's category for attorneys with over 31 years of experience, *see USAO Attorney's Fees Matrix – 2015-2019*, https://www.justice.gov/usao-dc/file/796471/download (last visited Dec. 8, 2020).

7

request fell short, *id.* at *7. Second, the applicant can provide "evidence of the fees charged[] and received" by litigators in cases brought under the fee-shifting statute in question. *Reed*, 843 F.3d at 521. In their response to the court's Fees Opinion, Plaintiffs try both approaches.

      a.      <u>Complex federal litigation</u>

Plaintiffs first double down on their argument that this case qualifies as complex federal litigation, warranting application of the LSI *Laffey* Matrix rates. *See* Pls.' Resp. at 2–5. Pushing back on the court's observation in its Fees Opinion that this case "required no discovery nor any specialized non-legal knowledge," *see 12 Percent I*, 2020 WL 1429904, at *7, Plaintiffs counter that those are but two of several factors articulated by the court in *Laffey v. NW Airlines*, 572 F. Supp. 354 (D.D.C. 1983), and "[n]either factor is dispositive," Pls.' Resp. at 2. But Plaintiffs' reliance on *Laffey* serves only to highlight the relative lack of complexity of this case. They explain:

> The *Laffey* Court considered seven broad factors in analyzing the litigation's complexity: (1) its posture as a class action on behalf of over 3,300 plaintiffs; (2) the implication of almost all of the defendant's employment practices; (3) the large number of factual and legal issues; (4) the need for the plaintiffs to conduct extensive investigation and discovery; (5) the lack of significant binding precedent defining the controlling legal standards; (6) the presence of a well-financed corporate defendant; and (7) the protracted length of the litigation.

*Id.* at 2–3. This case is nowhere in the same ballpark. Whereas the *Laffey* litigation spanned thirteen years, this case concluded within two-and-a-half. *See id.* at 3. Whereas *Laffey* was "a class action on behalf of 3,300 plaintiffs," *id.* at 2, this case, not a class action, was filed on behalf of two organizations, *see* Compl. ¶¶ 5–6. And whereas *Laffey* implicated "almost all of the defendant's employment practices," Pls.' Resp. at 2–3, Plaintiffs' successful Sunshine Act claims are isolated to Defendant Unified Carrier Registration ("UCR") Plan Board's (the "Board") practices with respect to a single issue—timely and adequate notice of meetings, *see generally*

8

Am. Compl. Plaintiffs simply cannot dismiss the fact, as noted by the court in the Fees Opinion, that this "case required no discovery nor any specialized non-legal knowledge." *12 Percent I*, 2020 WL 1429904, at *7 (citing *Reed*, 843 F.3d at 525 (observing that "the absence of discovery may suggest that [Individuals with Disabilities Education Act] cases are not as complex as cases in which discovery is extensive")). Although the court appreciates that the work Plaintiffs' counsel had to do in "analy[zing] [] the UCR Board's practices related to 124 UCR Board meetings and subcommittee meetings, held over a period of eleven-plus years" was likely arduous, Pls.' Resp. at 3, that work does not rise to the level of complexity that warrants application of the LSI *Laffey* Matrix rates, *cf. Urb. Air Initiative*, 442 F. Supp. 3d at 308–10, 323 (finding plaintiffs had not shown FOIA case involving production of thousands of records and cross motions for summary judgment justified application of "higher LSI adjusted *Laffey* Matrix rates"). Arguably, the only factor even remotely weighing in Plaintiffs' favor is the unsettled state of the law with respect to the Sunshine Act, *see* Pls.' Resp. at 3–4, and Plaintiffs provide no case showing that factor alone is enough to deem the litigation "complex." Plaintiffs have thus failed to show that the LSI *Laffey* Matrix is presumptively applicable in this case, and the court must therefore look to the second approach to determine the prevailing market rate—evidence of fees charged and received by litigators in similar cases. *Reed*, 843 F.3d at 521.

    b.  <u>Fees charged in similar cases</u>

To establish the prevailing market rate using the second approach, a fee applicant must rely on more than a fee matrix alone. The D.C. Circuit has held that acceptable evidence to "supplement[] fee matrices . . . [includes] 'surveys to update [the matrices]; affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases; and evidence of recent fees awarded by the court or through settlement to

9

attorneys with comparable qualifications handling similar cases.'" *Eley*, 793 F.3d at 101 (quoting *Covington*, 57 F.3d at 1109); *see also Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1326 ("[W]hen the attorney states his belief as to the relevant market rate, he should be able to state . . . that it was formed on the basis of several specific rates he knows are charged by other attorneys.").

Responding to this court's admonishment in the Fees Opinion that Plaintiffs had failed to provide any "proof of prevailing rates . . . [other than] the LSI *Laffey* Matrix itself," *12 Percent I*, 2020 WL 1429904, at *7, Plaintiffs attach to their response a survey of cases in which courts in this Circuit have decided whether the LSI *Laffey* Matrix or the USAO Matrix applied to determining fee awards in Freedom of Information Act ("FOIA") cases, *see* Pls.' Resp., Ex. A, ECF No. 132-1.[4] "Since April of 2010," Plaintiffs explain, "thirty-two decisions in D.C. district courts have analyzed the prevailing market rates for FOIA litigation." Pls.' Resp. at 7. "In twenty-three of these cases," or a clear majority, the "USAO Matrix rates were awarded to eligible and entitled plaintiffs." *Id.* "USAO rates are accepted by D.C. district courts as presumptively reasonable for FOIA litigation," Plaintiffs explain, and therefore "can be used as the prevailing market rate for the work that was performed here." *Id.* Plaintiffs therefore insist that, should the court reject its primary argument that the case is sufficiently complex to warrant application of the LSI *Laffey* Matrix rates—as the court has now done—the USAO Matrix rates should apply. *Id.*

In their reply brief, Plaintiffs contend that "[p]utting aside the question of complexity, the LSI matrix should be applied because, as the D.C. Circuit has observed, the LSI Matrix is more *accurate* than the USAO Matrix." Pls.' Reply in Supp. of Pls.' Resp to Ct.'s Order, ECF No. 135 [hereinafter Pls.' Reply], at 5 (footnote omitted). But that argument mischaracterizes the scope of

---

[4] Given the absence of any cases addressing the Sunshine Act's attorneys' fees provision, the parties have agreed—and the court has decided—to look to FOIA cases for guidance because the Sunshine Act bears a close relationship to FOIA. *See 12 Percent I*, 2020 WL 1429904, at *3.

10

the D.C. Circuit's holding in *DL v. District of Columbia*. The decision in *DL* is limited to cases, unlike this one, where the fee applicant satisfies its burden of showing that the case involves complex federal litigation. *See* 924 F.3d at 591–92. Therefore, the court cannot simply "put[] aside the question of complexity," and nothing in *DL* compels this court to apply the LSI *Laffey* Matrix over the USAO Matrix in this Sunshine Act case.[5]

For its part, Defendant UCR agrees that the USAO Matrix rates presumptively apply in FOIA litigation and that they should be applied here. *See* Def.'s Opp'n to Pls.' Resp. to Ct.'s Order, ECF No. 134 [hereinafter Def.'s Opp'n], at 6.[6] Accordingly, because Plaintiffs have failed to show that this case qualifies as complex federal litigation, and because the rates actually charged by Plaintiffs' attorneys are in line with the USAO Matrix rates, Plaintiffs have not met their burden to show that it would be reasonable to apply the higher LSI *Laffey* Matrix rates. The court therefore will apply the USAO Matrix rates to determine the fee award.

### B.     The Reasonableness of the Hours Expended

Turning to the next element in the lodestar calculation, the court must identify the hours billed for which Plaintiffs can recover attorneys' fees. To show the reasonableness of the number of hours spent, an applicant must submit "sufficiently detailed information about the hours logged and the work done . . . to permit the District Court to make an independent determination whether or not the hours claimed are justified." *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1327.

---

[5] Plaintiffs also note that only two of the 32 decisions in its case survey were decided after *DL*, suggesting that the myriad decisions applying the USAO matrix in FOIA cases "pre-*DL*" should be given less weight. *See* Pls.' Resp. at 7. But both cases decided after *DL* illustrate this court's point—that *DL* is limited to cases involving complex federal litigation. *See Barton*, 2019 WL 4750195, at *6 (noting in "*DL* . . . it was undisputed that the case[] w[as] properly characterized as 'complex federal litigation'"); *Urb. Air Initiative*, 442 F. Supp. 3d at 323 (explaining that the LSI Matrix is designed for complex litigation and finding that plaintiffs had "not met their burden to show that it would be reasonable to apply the higher LSI adjusted *Laffey* Matrix rates").

[6] Although Defendant argues for a 2% reduction of the USAO rates, *see* Def.'s Opp'n at 6, that argument appears to be based on a misinterpretation of Plaintiffs' representation concerning its national hourly rates, *see* Pls.' Reply at 6 (explaining that BLF's "national hourly rates would have resulted in a 2% *increase* over the USAO Matrix rates" (emphasis added)). The court therefore declines to impose a 2% reduction.

"Fees are not recoverable for nonproductive time[,] nor . . . time expended on issues on which [the] plaintiff did not ultimately prevail." *Id.* Therefore, the court must "consider[] the relationship between the amount of the fee [requested] and the results obtained." *See Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 76 (D.D.C. 2013) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). The "most critical factor" in determining the reasonableness of Plaintiffs' fee request in cases, like this one, where plaintiffs have "achieved only partial or limited success" is "the degree of success obtained." *See Hensley*, 461 U.S. at 436. As the Supreme Court explained in *Hensley*, "[t]here is no precise rule or formula for making th[is] determination[]." *Id.* The court may either "attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Id.* at 436–37. This court takes the latter approach.

On this task too, the court's Fees Opinion was instructive. "Plaintiffs' [original] Fee Chart contain[ed] over 130 pages of individual billing entries, a number of which correspond[ed] to work that [was] not compensable because Plaintiffs were ultimately unsuccessful on those claims." *See 12 Percent I*, 2020 WL 1429904, at *8 (citing Bopp Decl., Ex. 3, ECF No. 116-5). Unwilling to "parse through Plaintiffs' billing records to ascertain which entries relate[d] to which partially successful claims," the court instructed Plaintiffs to "submit an amended declaration" that "segregate[d], or otherwise identif[ied], the time entries devoted to the [following partially successful] tasks":

(1) Plaintiffs' Complaint and Amended Complaint, ECF Nos. 1, 35;

(2) Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 2;

(3) Plaintiffs' Second Motion for Preliminary Injunction Pending Appeal, ECF No. 53; and

>  (4) Plaintiffs' Motion for Summary Judgment, ECF No. 75.

*12 Percent I*, 2020 WL 1429904, at *8. Plaintiffs were further instructed to "include proposed aggregate fee totals for tasks associated with their successful claims and efforts." *Id.* The court explained that it would then "discount the fee award as to each task based on the degree of success achieved." *Id.*

Plaintiffs have done as the court requested, providing segregated and aggregate totals for work done on the specified tasks. *See* Pls.' Resp. at 14, 17–23. But they also have gone further. They claim entitlement to fees for tasks not specified by the court. Plaintiffs divide the work for which they seek fees into three categories: They request (1) $99,729.40[7] for the tasks specified by the court in the Fees Opinion, *see id.* at 14; (2) $120,768 for "work unspecified by the Court, but partially related to [their] Sunshine Act claim[s]," *id.* at 20; and (3) $94,953.20 for additional "work related to a Court order or requirement," *id.* at 21, 23. These sums do not reflect any discount for partial success, as Plaintiffs have left such reductions to the court.

The court turns now to considering "the relationship between the amount of the fee [requested for each of these tasks] and the results obtained." *Elec. Privacy Info. Ctr.*, 999 F. Supp. 2d at 76. The natural starting place for such an inquiry is Plaintiffs' claims. In their initial Complaint, Plaintiffs asserted four separate claims—three against the Board (one under the Sunshine Act and two under the Administrative Procedure Act) and one against the Indiana Department of Revenue ("INDOR") under the UCR Agreement. *See* Compl., ECF No. 1, ¶¶ 37–71. Of those, Plaintiffs ultimately prevailed on only the Sunshine Act claim. *See 12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.* (*12 Percent II*), Case No. 17-cv-2000, 2019 WL 450676, at *3 (D.D.C. Feb. 4, 2019). That claim pertained to the Board's failure to

---

[7] Because the court has decided to utilize the rates within the USAO Matrix, it refers only to those requested rates.

13

adequately notice a September 14, 2017 meeting. *Id.* Plaintiffs then Amended their Complaint, *see* Am. Compl., ECF No. 35 [hereinafter Am. Compl.], where they "substantially expanded their Sunshine Act claim," *12 Percent II*, 2019 WL 450676, at *3. In conjunction with their Amended Complaint, Plaintiffs "undertook a historical survey of nearly 125 Board meetings and asserted that the Board, for years, had routinely violated the Sunshine Act in multiple ways, including failing to publicly announce meetings, giving untimely notice of meetings in the Federal Register, and issuing boilerplate descriptions of anticipated business at meetings." *Id.* (citing Am. Compl. ¶¶ 23–27). That survey brought Plaintiffs' claims under the Sunshine Act to four. They also "renewed their claim against the Board and INDOR under the UCR Agreement," *id.*, for a total of six claims. Of those, Plaintiffs ultimately succeeded on two. The court granted Plaintiffs' Motion for Summary Judgment in part, finding that the Board violated the Sunshine Act by (1) making public only boilerplate descriptions of the subject matter of all meetings and (2) by failing to provide timely notice of subcommittee meetings. *See id.* at *1. "With regard to [the] other aspects of Plaintiffs' Sunshine Act claim, and their claim alleging a violation of the UCR Plan Agreement[,] . . . the court entere[ed] judgment in favor of Defendants." *Id.*

Having thus "prevail[ed] on two while losing on four" claims, Defendant argues that Plaintiffs "should be awarded [] no more than one-third of the total amount of their counsel's charges for the Court's specifically identified tasks." Def.'s Opp'n at 10. Although Defendant's approach has practical appeal, applying a blanket 67 percent reduction and awarding Plaintiffs fees only for the tasks expressly identified in the Fees Opinion would sell Plaintiffs short for several reasons. For starters, Defendant reads the Fees Opinion too narrowly. It asserts that "the Court need not and should not consider the 'related to' . . . entries" because "the tasks the Court has specifically identified mark[] the outer limit of what can legitimately be claimed by Plaintiffs in

this case." *Id.* at 8. But by specifying the tasks that it did, *see 12 Percent I*, 2020 WL 1429904, at *8, it was never the court's intent to exclude related filings, such as reply briefs, in support of those specified tasks. Indeed, many of the "related filings" were what the court had in mind when asking Plaintiffs to "include proposed aggregate fee totals for tasks associated with their successful claims and efforts." *Id*.

The court addresses additional reasons for rejecting Defendant's approach in the context of the three categories of tasks for which Plaintiffs seek fees. The court begins with the first and second categories—those specified by the court in the Fees Opinion and those tasks that were not expressly specified by the court but that Plaintiffs claim are "at least partially related to successful claims the Court has specified." Pls.' Resp. at 12. The court then turns to analysis of the third category of tasks—those undertaken in response to court orders or other procedural requirements and those that Plaintiffs claim are "wholly related to the ultimately successful Sunshine Act claims." *See id*. at 20–23.

  1. *Specified and Related Tasks*

Starting with those tasks specifically identified by the court in the Fees Opinion, the court finds that awarding Plaintiffs only 33 percent of those fees, as Defendant requests, would be insufficient. Due to the interrelation of the issues arising from Plaintiffs' four Sunshine Act theories, the tasks associated with those claims likely involved overlapping work. *See Hensley*, 461 U.S. at 435 (acknowledging that "[i]n [some] cases the plaintiff's claims for relief will involve a common core of facts or . . . related legal theories[,]" which "mak[es] it difficult to divide the hours expended on a claim-by-claim basis"). Accordingly, the court will apply a slight upward adjustment, awarding Plaintiffs 40 percent of the fees requested for the work done on the

Complaint, Amended Complaint, and Plaintiffs' Motion for Summary Judgment,[8] amounting to $33,934.44.  The same reasoning applies to the fees requested for Plaintiffs' first Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI"), and the reply in support thereof, ECF Nos. 2, 29.  There too, Plaintiffs lost on their claim against INDOR and did not secure nullification of the Board's actions as sought, but did obtain some modest relief under their Sunshine Act claim.  *See generally 12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, 282 F. Supp. 3d 190 (D.D.C. 2017) (ordering the Board to "immediately publish any draft minutes, transcripts, or recordings of the September 14 meeting on its website").  The court therefore awards Plaintiffs 40 percent of the fees requested in association with that filing, or $18,776.60.

Additionally, the court finds that Plaintiffs are entitled to greater than 40 percent of the fees requested for some tasks, commensurate with their level of success.  For example, Plaintiffs fared slightly better on their Motion for a TRO and PI Pending Appeal, *see* ECF Nos. 49, 53, prevailing on one of two theories of harm regarding the UCR Plan Board's inadequate noticing of subcommittee meetings, *see 12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, 289 F. Supp. 3d 73, 79 (D.D.C. 2018).  The court therefore awards Plaintiffs 50 percent of the fees requested for the work done in support of their motion for injunctive relief pending appeal, amounting to $13,006.15.[9]  Plaintiffs also request reimbursement for two other tasks that they claim were "directly relate[d] to [their] ultimate[] success[]" on summary judgment, *see* Pls.' Resp. at 20—their Reply to the Declaration of Chairman Gutierrez, ECF No. 103, and the Opposition to Defendant's Motion to Strike that Reply, ECF No. 105.  Because the court only partially relied on

---

[8] This includes hours expended on Plaintiffs' Response to UCR Board's Cross-Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment, ECF No. 97.  *See* Pls.' Resp. at 19.
[9] This amount includes the hours expended on Plaintiffs' Reply in Support of Plaintiffs' Second Motion for PI Pending Appeal, ECF No. 59.

the Reply in deciding the parties' cross motions for summary judgment, *see 12 Percent II*, 2019 WL 450676, at *6 & n.6 ("consider[ing] the record evidence referenced therein" but rejecting new legal arguments contained in the Reply), the court will award Plaintiffs 50 percent of the fees requested for those tasks, or $9,968.55.

Other tasks in the second category, however, are associated with claims upon which Plaintiffs were either entirely unsuccessful or are associated with the appeal that Plaintiffs noticed but ultimately voluntarily dismissed. *See 12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, No. 17-5287, 2018 WL 3156843, at *1 (D.C. Cir. May 29, 2018). For example, Plaintiffs request $41,056.30 in fees associated with their Second and Third Motions for TRO and PI, *see* Pls.' Resp. at 17–18, but Plaintiffs failed to obtain any relief on their Sunshine Act claims with those motions, *see 12 Percent Logistics Inc. v. Unified Carrier Registration Plan Bd.*, 280 F. Supp. 3d 118, 124–25 (D.D.C. 2017) (denying Plaintiffs' second motion for a TRO and PI); Order, ECF No. 47 (denying Plaintiffs' third motion for a TRO and PI). Plaintiffs therefore are not entitled to compensation for those tasks, despite their best efforts to spin them as connected to their successful Sunshine Act claims. *See George Hyman Constr. Co. v. Brooks*, 963 F.2d 1532, 1537 (D.C. Cir. 1992) (holding that a court must "prevent [a] claimant from 'piggybacking' fees incurred for work done on losing claims onto unrelated winnings issues").

2.   *Work Related to Court Orders or Requirements*

Moving on to the third category of tasks, Plaintiffs seek $94,953.20 in fees for a host of tasks, mostly pertaining to court orders or other procedural requirements, which they assert are "wholly related to the ultimately successful Sunshine Act claim[s]." *See* Pls.' Resp. at 20–23. Of those 20 tasks, the court finds Plaintiffs are entitled to fees for seven of them. The court awards Plaintiffs 100 percent of the fees requested for their response to the Court's Order to Show Cause,

ECF No. 11, their notice regarding the winter UCR Plan Board meeting agenda, ECF No. 54, and their work relating to notice of meeting to the Federal Register, ECF No. 66, as well as for travel,[10] *see* Pls.' Resp. at 23, as those tasks are entirely related to Plaintiffs' successful Sunshine Act claims. The court also awards 50 percent of the fees requested for the Joint Status Report filed on November 2, 2017, ECF No. 34, because half of that report pertained to the Board's compliance with the court's Order granting Plaintiffs injunctive relief, and for Plaintiffs' catch-all sub-category of tasks for "[w]ork exclusively related to [their] Sunshine Act" claims (for which they were 50 percent successful), Pls.' Resp. at 23. And, commensurate with Plaintiffs' overall level of success on its Sunshine Act claims, *see supra* pp. 15–16, the court awards 40 percent of the fees requested for Plaintiffs' catch-all sub-category of tasks "[g]enerally" related to their litigation strategy, *see* Pls.' Resp. at 22. The court therefore awards a total of $18,491 for these seven tasks.[11]

The court finds that Plaintiffs are not entitled to an award of fees for the remainder of the tasks in this category, as many of them were caused by Plaintiffs' own failures, *see, e.g.*, Pls.' Resp. to Ct.'s Order, ECF No. 15 (responding to court's Order regarding Plaintiffs' improper service of process); were unsuccessful, *see, e.g.*, Mot. to Consolidate Hearings, ECF No. 3 (denied by Minute Order, Oct. 18, 2017); Pls.' Req. to Schedule Oral Hr'g, ECF No. 108 (denied as moot by Order, Feb. 4, 2019); were related to the appeal Plaintiffs voluntarily dismissed, *see, e.g.*, Pls.' Resp. at 21 (listing "Appeal" and "Appellate Court Mediation"); or are of unclear relation to Plaintiffs' successful claims, *see, e.g.*, Pls.' Resp. at 21 (listing general task titled "Subcommittee Sunshine Act").

---

[10] Plaintiffs note that their "[t]ravel time has already been adjusted to 50%," *see* Pls.' Resp. at 23 n.4, as "[i]n this [C]ircuit, travel time generally is compensated at no more than half the attorney's appropriate hourly rate," *Blackman v. District of Columbia*, 397 F. Supp. 2d 12, 15 (D.D.C. 2005) (citing *Cooper v. U.S. R.R. Ret. Bd.*, 24 F.3d 1414, 1417 (D.C. Cir. 1994)).

[11] The court notes that at no point does Defendant question or challenge the reasonableness of the actual time expended on these tasks, or any other for that matter. The court therefore has not undertaken to evaluate whether counsel spent too much time on a particular task.

\* \* \*

Accordingly, the total award for all three categories of tasks is $94,176.74.  Attached to this Memorandum Opinion is a chart reflecting the court's calculation of fees recoverable for each of Plaintiffs' requested tasks, consistent with the discussion above.  *See* Exhibit A.  As the amount awarded is approximately 30 percent of the $315,450.60 in fees that Plaintiffs requested for litigation on the merits, the court will apply that same percentage to Plaintiffs' request for $7,022.05 in litigation costs and expenses, *see* Pls.' Resp., Ex. 2 to Suppl. Bopp Decl., ECF No. 132-5, at 14, bringing that total to $2,106.61.  The court thereby awards Plaintiffs $96,283.35 in attorneys' fees, costs, and expenses for their successful Sunshine Act claims.

### C. Fees on Fees

Plaintiffs also seek $92,790.64 in "fees on fees," including costs and expenses, incurred by their counsel in litigating their fees request.  *See* Suppl. Bopp Decl. ¶ 9; *see also Means v. District of Columbia*, 999 F. Supp. 2d 128, 131 n.1 (D.D.C. 2013) (observing that motions requesting recovery of fees incurred in preparing fee petitions are commonly referred to as motions for "fees on fees").  At the outset, the court finds that Plaintiffs are not eligible for fees on fees for their counsel's work in response to the court's Fees Opinion, for which they seek $25,274.50, *see* Suppl. Bopp Decl. ¶ 9, as the response was precipitated by deficiencies in Plaintiffs' original fee petition, *see 12 Percent I*, 2020 WL 1429904, at *1 (denying Plaintiffs' motion in part and ordering them to provide supplemental information for the fee determination).  *See INS v. Jean*, 496 U.S. 154, 163 n.10 (1990) (noting that a court should not award fees on fees to a prevailing party for time spent on aspects of the initial fees request that proved unsuccessful).  Next, just as it did above, the court will apply the hourly rates set forth in the USAO Matrix to determine the appropriate fees-on-fees award.  *See Prunty v. Vivendi*, 195 F. Supp. 3d 107, 117 (D.D.C. 2016) (applying the

USAO Matrix rates to defendants' fees-on-fees request). The court also will "reduce[] the fees-on-fees award to reflect [Plaintiffs'] degree of success on their fee petition." *Id.* Consistent with Plaintiffs' level of success on its award for merits litigation fees, the court applies a 70-percent reduction to the eligible fees on fees ($67,516.14), thereby reducing that award amount to $20,254.84.

IV.

For the foregoing reasons, the court awards Plaintiffs $116,538.19 in attorneys' fees, costs, and expenses on their Application and Motion for Attorneys' Fees, Costs, and Expenses Under the Sunshine Act, ECF No. 116. A separate final Order accompanies this Memorandum Opinion.

Dated: December 9, 2020

Amit P. Mehta
United States District Judge